IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 21-CR-30003-DWD |
| ) | |
| FRANK SMITH, ) | |
| WARREN GRIFFIN, ) | |
| ANTHONY DOBBINS, ) | |
| SEAN CLEMON, ) | |
| DOMINIQUE MAXWELL, ) | |
| PERRY HARRIS, and ) | |
| BARRY BOYCE, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER

Pending before the Court is Defendant Anthony Dobbins' Motion to Exclude the Government's Expert Testimony Regarding Historical Cell-Site Information and Testimony Produced by the Cellebrite Tool (doc. 398) and Defendant Warren Griffin's Motion to Exclude Testimony and Evidence Regarding Historical Cell Site Information and Cellebrite UFED Tool (Doc. 400). The Government has responded in opposition (Docs. 450 and 449), and the Court heard oral argument on both motions on for the limited purpose of assessing whether a *Daubert* hearing is warranted and determined that such a hearing was appropriate. The Court conducted Daubert hearing on December 9, 2022 at which time it received testimony of Greg Caty and arguments of counsel.

## BACKGROUND

On December 13, 2022, the grand jury returned a thirteen-count superseding indictment against Griffin, Dobbins, and three other alleged members of the Gangster Disciples street and prison gang (Doc. 671).[1] The indictment charges the Defendants with conspiring to violate the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et. seq.*, through their alleged involvement with the Gangster Disciples. The indictment also charges the Defendants with numerous violent crimes and firearms offenses in connection with the racketeering conspiracy. Griffin and Dobbins are personally charged with RICO conspiracy (Count 1), murder in aid of racketeering (Count 11), use of a firearm during and in relation to a crime of violence (Count 12), and use of a firearm during and in relation to a crime of violence causing death (Count 13).

As is relevant to the instant motion, the Indictment alleges that Dobbins and Griffin were leaders in the gang (each was allegedly a "Board Member") and murdered Ernest Wilson in Chicago, Illinois on May 18, 2018. The Indictment also alleges Dobbins' involvement in various drug trafficking activities.

The Government has disclosed Greg A. Catey, an FBI special agent with the Cellular Analysis Survey Team ("CAST"). The Government's disclosure states that Catey will testify that "cell phones used by the defendants and their coconspirators were present in the vicinity of certain significant locations where crimes alleged in the indictment occurred." (Doc. 379).

---

[1] The original indictment was returned on January 20, 2021. It included thirteen counts directed against Griffin, Dobbins, and five other alleged members of the Gangster Disciples street and prison gang (Doc. 1).

Generally, Dobbins and Griffin contend that SA Catey's testimony should not be admissible because testimony related to historical cell site analysis is unreliable.[2] The Government, on the other hand, argues that Cell site analysis is an established and accepted law enforcement tool and that agents from the FBI's CAST have been recognized as qualified experts in this field – including in the Southern District of Illinois. The Government also notes that the Seventh Circuit has examined and affirmed the admissibility of historical cell-site analysis on at least three occasions. The Government also contends that Defendants' motions should fail because (1) Defendants arguments go to the weight of the evidence and not its admissibility and (2) historical cellular analysis is well-established and there is a wide consensus in the judicial community that historical cell site data is a reliable methodology.

Second, Dobbins and Griffin contend that the testimony should be excluded under Federal Rule of Evidence 403, because its probative value is substantially outweighed by the danger of unfair prejudice. The Government contends that SA Catey's expert testimony is relevant as a means to prove that Dobbins and Griffin were in the general vicinity of specific locations at various times relevant to the Government's case. Specifically, the Government states that the cell-site evidence shows that Dobbins and Griffin were in the general vicinity of the murder scene, during the time period of the murder, that Dobbins' phone traveled from southern Illinois to Chicago during the relevant time period, and that Dobbins was in the general vicinity of Griffin's residence

---

[2] Neither Dobbins nor Griffin contest that Agent Catey is qualified as an expert by knowledge, skill, experience, training, or education.

3

before and after the murder. It also shows that Dobbins' phone traveled from Chicago to East St. Louis after the murder and that his phone was in the general vicinity of the hospital where he is believed to have sought treatment for a gunshot wound.

Finally, Defendants contend that Cellebrite technology is unreliable. Cellebrite is a third-party Israeli digital intelligence company (Cellebrite Mobile Synchronization, Ltd) that develops digital intelligence platforms. Law enforcement agencies use the company's Universal Forensic Extraction Device (UFED) tool to download data from cellular telephones and to organize that data so it can be reviewed. Cellebrite is ordinarily used as a software program, which can be installed onto a law enforcement computer. Cellebrite, however, also has devices that can be utilized without a computer. Defendants contend that the Court must make a preliminary determination under Rule 702 about the reliability of Cellebrite software before evidence from a cellular phone extraction can be introduced at trial. They also contend the Government needs an expert to testify about how Cellebrite works. The Government disagrees, arguing that Cellebrite software does not implicate Rule 702.

## LEGAL STANDARD

"A district court's decision to exclude expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Brown v. Burlington Northern Santa Fe Ry. Co.*, 765 F.3d 765, 771 (7th Cir. 2014); *see also Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). The *Daubert* standard applies to all expert

testimony, whether based on scientific competence or other specialized or technical expertise. *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)).

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. Under this rule, expert testimony must be both relevant to assisting the trier of fact and sufficiently reliable. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015).

The district court is the gatekeeper with respect to the screening of expert testimony. *Id.* The "key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion; the inquiry must 'focus ... solely on principles and methodology, not on the conclusions they generate.' " *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (citing *Daubert*, 509 U.S. at 595). "So long as the principles and methodology reflect reliable scientific practice, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' " *Id.* (quoting *Daubert*, 509 U.S. at 596).

5

Finally, an expert must explain the methodologies and principles that support his or her opinion; he or she cannot simply assert a "bottom line" or *ipse dixit* conclusion. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (quoting *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010)). "[W]here such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question ... the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.' " *Kumho*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592). The district court possesses "great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (citing *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007)). "The critical inquiry is whether there is a connection between the data employed and the opinion offered." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017) (quotation omitted).

## DISCUSSION

I. THE RELIABILITY, RELEVANCE AND RELATEDNESS OF AGENT CATEY'S TESTIMONY AND HISTORICAL CELL ANALYSIS UNDER RULE 702 AND *DAUBERT*

Dobbins and Griffin contend that historical cell analysis is unreliable and fails *Daubert* scrutiny. More specifically, Dobbins and Griffin argue that Agent Catey's historical cell site analysis, and, in particular, the underlying data for it, lacks precision because Call Detail Records ("CDRs"), which contain information about cell tower and equipment identity, is inaccurate. This lack of accuracy is increased, they contend, because cellular

6

phones do not always connect to the nearest tower, that the cell coverage of any given cell tower is not uniform, and that signal strength is degraded or at least affected by the presence of ground obstacles such as buildings and trees. And they further claim that Agent Catey did not "drive test" the cell towers to confirm cell coverage, signal strength, or the accuracy the location of the towers referenced in his report.

The Government established the scope of Agent Catey's expected testimony. In its Notice of Expert witnesses, the Government indicates that Agent Catey's testimony "will establish that cell phones used by the defendants and their coconspirators were present in the vicinity of certain significant locations where crimes alleged in the indictment occurred." (Doc. 398-2). Similarly, the Government's counsel confirmed during the hearing that Agent Catey's testimony will not be offered to establish a precise location of any cell phone. Rather, his testimony and historical cell analysis will serve to place the referenced cell phones within the coverage area of a particular cell site at a particular time such that it communicated with that site's equipment. Agent Catey's testimony at the hearing was consistent with the Government's representations.

It is true that there are notable concerns with the accuracy and reliability of historical cell site analyses and their use in criminal matters. *See* Victoria Saxe, Note, *Junk Evidence: A Call to Scrutinize Historical Cell Location Evidence*, 19 U.N.H. L. Rev. 133 (2020). However, most criticisms are directed at reports and witnesses testifying that such analyses can reliably and precisely establish the *precise location* of a cell device. The differentiation between claims of the ability to precisely determine the geographical

location of a cell device and analyses that determine when a cell device connected to a particular cell site, was made in *United States v. Hill*, 818 F.3d 289, 295 (7th Cir. 2016).

In *Hill*, an Agent Raschke testified about historical cell-site analysis and general scope and purpose of his testimony which is not unlike that proffered here. Agent Raschke testified that Hill's cell phone records and the locations of relevant cell sites placed his cell device roughly a mile and half from the Credit Union that was robbed. Significantly, Agent Raschke was able to trace connections between Hill's cell phone and nearby towers as he rapidly moved north along the interstate and, shortly thereafter, arrived near his residence and an hour later at his workplace. *Id* at 297-298. Importantly, Agent Raschke also testified that Hill's cell device's use of a cell site did not mean that Hill was at any particular spot near the tower. *Id* at 298. This qualification, the Court noted, saves his testimony from being inadmissible. The Court reached the conclusion that "[h]istorical cell-site analysis can show with sufficient reliability that a phone was in a general area, especially a well-populated one". *Id*.

Here, Agent Catey made clear that he will not testify as to exact location of any cell device. Rather, he analyzed CDR data for the cell devices in question and compared that data to cell site information to arrive at an assessment that those devices were located within the coverage area of the cell site at a given time. According to Agent Catey's testimony, he was able to determine from the CDR information that, over a period of time, the cell devices connected to a number of cell sites. From that data, Agent Catey was able to determine the direction and time of travel of the devices in and around

8

Chicago and south. This is the very type of testimony presented in *Hill* and approved on review.

Defendants further argue that CDR data is not reliable or "100%" accurate because CDR records are sometimes lost due to irrecoverable digital transfer errors and that these errors are not always indicated in the data. (Doc. 400 at 9). Dobbins does not develop this argument and only cites to a peer article, John B. Minor, *Forensic Cell Site analysis: Mobile Network Operator Evidence Integrity Maintenance Research*, 14 J. Digit. Forensics, Security & L. 59, 69 (2019). A review of that work does indeed reveal the author's passing reference to the possibility of an error when information about users' activities does not find its way into the proper digital file folder. However, and maybe more helpful to any *Daubert* analysis, the author also indicates that:

> "[Mobile Network Operators and Mobile Virtual Network Operators] *charging/billing system necessarily maintains careful accounting of subscriber communications activities*. The charging/billing system of each MNO/MVNO is operated according to standards established by a variety of organizations, including national and international bodies. Charging Data Records, commonly known as Call Detail Records (CDRs) are maintained and produced from a standards-based data flow to the Charging Gateway Function and into the CDR database in a format established by standards.

*Id* at 67 *(emphasis added)*

So, while a MNO's records may not have been designed for exactly the same purposes for which the Government seeks to make use of them, consistent with the author's words, Agent Catey's testimony concerning CDR data referenced that the network operators through their billing or revenue motivations and maintenance needs

9

still provide reliable data regarding users' activities. And though Defendants seek assurances of 100% accuracy in data underlying Agent Catey's analysis and testimony, they offer no authority for the proposition that *Daubert* or Rule 702 requires that level of precision.

Dobbins next argues that the data is lacking because historical cell site analysis makes faulty assumptions about coverage area because the data provide no information about the strength of a given tower's signal. (Doc. 398 at 10) He continues by saying that absent a drive test to verify signal strength the reliability of the methodology is not to be trusted. *Id*.

The Court recognizes that there appears to be no dispute that a cell device will not always connect to or communicate with a cell tower just because it is physically or geographically closer than another tower. There also seems to be no dispute that signal strength (along with physical obstructions and meteorological conditions) plays a role in determining priority in connection and communication. These observations would be significantly more important here if the proposed testimony were to contend that the exact location of the cell device in question could and would be determined from the CDR data. That is not the case here. Agent Catey testified that his analysis goes to the Defendants' cell phones and their actual connections with identified cell sites at known locations as revealed in the CDRs, and not the potential for prioritized connectivity due to signal strength or weakness. Defendants offer nothing to suggest that signal strength or a test drive to assess signal strength of each cell site is necessary to ensure the reliability of the CDR data or Agent Catey's expected testimony.

Dobbins next argues that there is a dearth of peer review regarding the validity of historical cell site mapping and points to a study that "looked at factors, such as weather that can affect a site's signal strength." (Doc. 398 at 13) Dobbins points to a peer article to suggest that validation and error mitigation techniques are available to improve the accuracy of historical cell tower mapping. *See* John B. Minor, *Forensic Cell Site Analysis: A Validation & Error Mitigation Methodology*, 12 J. Digit. Forensics, Security, & L. 33 (2017). Dobbins suggests that because these error mitigation techniques are not often used, historic cell site analysis is not reliable. However, Mr. Minor's work does not make the proposition that non-utilization of otherwise available validation techniques deems the analysis necessarily invalid or unreliable. Rather, he criticizes the small percentage of analysts that attempted in his study of a hundred criminal and civil cases to verify the locations of cell sites or conduct drive tests to estimate signal strength. *Id* at 36-37. But, again, while such techniques (to verify precise tower location and signal strength) may be important to establishing an exact location of a cell device, their employment seems far less significant in cases where the analysis is offered to establish the general location of cell sites that connected or communicated with a specific cell device at a specified time.

Accordingly, the court finds that Agent Catey's proffered testimony is the product of reliable principles and methods and is based on sufficient facts and data to meet the requirements of Rule 703 as well as those of *Daubert*.

II. THE RELEVANCY OF AGENT CATEY'S ANALYSIS AND PROFFERED TESTIMONY UNDER RULE 403

11

Dobbins and Griffin also contend that Agent Catey's mappings (See Doc. 400-1) are not relevant under Federal Rule of Evidence 403. More specifically, they argue that the cell site depictions (red dots) used by Agent Catey are not relevant in that the shaded arc within the legs of a cell site vector will confuse or mislead the jury regarding the area of coverage or signal strength of a particular cell tower, and thereby casue prejudice. Doc. 400 at 4-5.

Under Federal Rule of Evidence 403, a Court may "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Agent Catey testified about the meanings and limitations of the depictions associated with the cell site locations found on his various maps found in Government's Exhibit 1. He made clear that the legs that converge at the cell site location are shown to demonstrate the "vector" or angle of coverage of an antenna on the cell tower. The shaded arc depicts the direction that the antenna is oriented and not the strength or range of that sites signal. However, he also testified that, in preparing the mapping, he adjusted the legs of the various cell site vectors.

As noted above, Agent Catey's testimony is not based upon the strength or range of cell site signals and he is not attempting to establish the location of any cell device. His testimony is directed to the connections made at given times between the cell devices in question and the cell sites identified in the CDRs. So, any potential for confusion or misleading of the jury is likely minimal and, in any case, easily avoided by Agent Catey's

testimony that the shaded arc does not represent the strength of area of coverage of a tower's signal.

Accordingly, the Court finds that the mapping evidence and Agent Catey's related testimony is not only probative and likely to aid the jury, but also relevant, not misleading or confusing, nor unfairly prejudicial to Dobbins or Griffin.

### III.  ADMISSIBILITY OF DATA EXTRACTED FROM CELLULAR DEVICES BY CELLEBRITE TECHNOLOGY

Dobbins and Griffin move to exclude evidence of data that was extracted from their respective cell device because the Government cannot establish that the Cellebrite UFED tool is reliable. (Doc. 398 at 16). The Government argues that Rule 702 and *Daubert* do not require an inquiry into the reliability of Cellebrite technology. Further it represents that the witnesses it presents in this case "will <u>not</u> be testifying about the technical workings of Cellebrite software" or offer any opinion about the Cellebrite technology. (Doc. 628 at 4)

Dobbins indicates that the Cellebrite UFED tool is a software program. When the Cellebrite UFED tool is connected to a device such as a cellular telephone, it creates a copy of the data located on that device (even if "locked" by the user) and transfers that data to another medium for storage and examination. (Doc. 398 at 17).

Dobbins recognizes that courts "frequently allow testimony regarding the *results* of a Cellebrite "copy" but have not analyzed the reliability of the purported copy in the first instance." (Doc. 398 at 17) (*emphasis supplied*). Dobbins claims that testimony about

13

the extraction of data via the Cellebrite device should not be permitted without first conducting a *Daubert* inquiry. The basis for Dobbins' position arises from observations made in a concurrence and dissent in *United States v McLeod*, 755 F. App'x 670 (9th Cir. 2019). There the trial court had permitted testimony of an investigating officer regarding his use of the Cellebrite UFED tool and its use to extract data from the defendant's phone to be admitted as lay testimony. The trial court did not require the Government to prove the reliability of the underlying technology, nor did it conduct a *Daubert* hearing. The dissent suggested that the testimony was not lay testimony but expert testimony under Rule 702 because the investigator discussed the Cellebrite UFED tool's uses, what it does, how it works and what he produces. The majority disagreed and determined that, even if the testimony was improperly admitted, it was harmless error.

Here the Government contends Cellebrite extraction does not implicate *Daubert*. It asserts that the purpose of Cellebrite software is to organize data so that it can be reviewed, and that is accomplished through the use of software supplied by Cellebrite and hardware consisting of a cable to establish a connection between the cell device and either a Cellebrite device or a common computer. Its witnesses will testify about the information found on the phone after connection and transfer is completed. The Government indicates that a witness testifying about the data from the cellular phone download will not offer an opinion. (Doc. 449 at 10)

While not definitive for the purposes of these motions, the guidance found in *United States v. Wehrle*, 985 F. 3d 549 (7th Cir. 2021) is nevertheless helpful in that it demonstrates that the line between expert testimony deserving *Daubert* analysis and lay

14

testimony is not always well demarcated. In *Wehrle*, the Defendant argued that the district court abused its discretion by failing to qualify Officer Wimmersberg as an expert witness when her detailed discussion of the technical aspects of her investigation deviated into opinion testimony under Federal Rule of Evidence 702. Wimmersberg testified about her investigation and the forensic examination process. She described her professional background and experience, as well as the methods she employed to extract the data from Wehrle's digital devices. She also detailed the hardware and software used to maintain the integrity of the original data. During her direct examination, she was asked, "How do you go about conducting a forensic examination of a device?" She first explained the use of a "write blocker," a tool that permits access to data while protecting the integrity of the seized device. She then described the use of data-extraction software. She also described the reliability and safeguards in the software that prevent any alteration of the original data, and she discussed other technical concepts such as hashes (which convert one value to another and can establish identity) and metadata (data which gives information about other data).

      The Court found that "[t]he forensic-examination process here implicated Rule 702 because Wimmersberg testified to technical concepts beyond ordinary knowledge." *Id*. at 554. [3] It noted that "[a]n officer testifies as an expert when he brings 'the wealth of his experience as [an] officer to bear on those observations and ma[kes] connections for the

---

[3] In the dissent by Justice St. Eve, she noted that "[a]lthough members of the general public may not be familiar with the particular programs [Wimmersberg] used to do so, the average person would be familiar with the concepts of extracting data from a device and preserving the data on the origin device." *Wehrle*, at 558 (7th Cir. 2021)

15

jury based on that specialized knowledge.' " *United States v. Gaytan*, 649 F.3d 573, 582 (7th Cir. 2011). Thus, a forensic-examination process falls within Rule 702's ambit if it involves "specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue." *Wehrle*, 985 F.3d at 553-554

Here, the government contends that it is not necessary to call an expert witness to testify about the technology that underlies the extraction of data from a device for that extracted data and the officers review of it to be received into evidence. This Court agrees so long as the witness does not veer off into the realm of an expert by attempting to explain technology and forensic processes for which he has no specialized knowledge. So long as this does not occur, Rule 702's reliability requirements are not implicated. This is not to say, however, that Dobbins and Griffin may not introduce evidence of the lack of reliability or validity of the extraction process to demean the evidentiary value, accuracy and weight of the data extracted.

## Conclusion

For these reasons, Defendant Anthony Dobbins' Motion to Exclude the Government's Expert Testimony Regarding Historical Cell-Site Information and Testimony Produced by the Cellebrite Tool (doc. 398) and Defendant Warren Griffin's Motion to Exclude Testimony and Evidence Regarding Historical Cell Site Information and Cellebrite UFED Tool (Doc. 400), are **DENIED**.

**IT IS SO ORDERED.**
Dated: December 15, 2022

DAVID W. DUGAN
United States District Judge