IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,  )
                                            )
           Plaintiff,  )
                                              )
vs.  )          **Case No. 21-CR-30003-DWD**
                                              )
FRANK SMITH,  )
WARREN GRIFFIN,  )
ANTHONY DOBBINS,  )
SEAN CLEMON, and  )
DOMINIQUE MAXWELL,  )
                                              )
          Defendants.  )
                                              )
                                              )

<u>MEMORANDUM AND ORDER</u>

**DUGAN, District Judge:**

Pending before the Court is Defendant Anthony Dobbins' ("Dobbins") Motion to Suppress Search Warrants of Residence Vehicle, Cell Phone, GPS and Precision Location Information and its Data (Doc. 494) ("Dobbins' Motion to Suppress"). Dobbins moves to suppress all evidence obtained as a result of the execution of six warrants, including a warrant issued for Global Position System ("GPS") data and information pertaining to his White 2006 Cadillac Escalade ("Cadillac GPS Warrant"). Dobbins contends that the warrant issued on June 29, 2018 (the earliest issued warrant), is lacking in probable cause because, *inter alia*, it contains misstatements of a video depicting the shooting of Ernest Wilson ("Wilson Video"). Dobbins claims that evidence seized in connection with the subsequently issued warrants must also be suppressed because they contain the same

inaccurate description of the Wilson Video and/or because they are fruits of the poisonous tree.

Defendant Warren Griffin ("Griffin") has also filed two motions that include claims which overlap with matters in issue in Dobbins' Motion to Suppress: (1) Motion to Suppress any and all Electronic Surveillance Including Call Intercepts, GPS, and/or Location Data (Doc. 464) (Griffin's First Motion to Suppress") and (2) Motion to Suppress Physical Evidence and Statements (Doc. 465) ("Griffin's Second Motion to Suppress"). Specifically, in Griffin's First and Second Motion to Suppress, he seeks to suppress all evidence seized as a result of the Cadillac GPS Warrant (Griffin had been a passenger in that vehicle). He also seeks to suppress all evidence seized as a result of two warrants for records pertaining a cellular telephone ending in 9807 and one warrant for records pertaining to four cellular telephones allegedly being used by Griffin. As to these search warrants, Griffin raises the same arguments as Dobbins: The warrants are void because they contained an inaccurate description of the Wilson Video and/or because they are fruits of the warrant issued on June 29, 2018.

This order addresses Defendants' arguments pertaining to the warrants referenced above. Additional arguments raised in Griffin's First Motion to Suppress (those pertaining to wiretap affidavits) and in Griffin's Second Motion to Suppress (those pertaining to the suppression of statements and identification) will be addressed by separate order.

The Government has responded in opposition (Docs. 543, 544, and 557). The Court held evidentiary hearings on pretrial motions in the instant case the week of November

2

14, 2022. The matters at issue in this order were addressed on November 15, 2022 (Doc. 617) and November 16, 2022 (Doc. 636). Following the hearings, Dobbins and the Government filed supplemental briefing (Docs. 600, 623, and 638). Dobbins and the Government have also supplemented the record with the affidavits supporting the disputed warrants and with video surveillance (Docs. 600, 602, 604, 605). Considering the record as a whole and for the following reasons, Dobbins' Motion to Suppress Search Warrants of Residence Vehicle, Cell Phone, GPS and Precision Location Information and its Data (Doc. 494) is **DENIED**. Additionally, those aspects of Griffin's First Motion to Suppress and Second Motion to Suppress seeking to suppress evidence seized as a result of the challenged warrants based on claims that they were lacking in probable cause are **DENIED**.

## I.   BACKGROUND

On December 13, 2022, the grand jury returned a thirteen-count superseding indictment against Griffin, Dobbins, and three other alleged members of the Gangster Disciples street and prison gang (Doc. 671).[1] The indictment charges the Defendants with conspiring to violate the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et. seq.*, through their alleged involvement with the Gangster Disciples. The indictment also charges the Defendants with numerous violent crimes and firearms offenses in connection with the racketeering conspiracy. Griffin and Dobbins are personally charged with RICO conspiracy (Count 1), murder in aid of racketeering

---

[1] The original indictment was returned on January 20, 2021. It included thirteen counts directed against Griffin, Dobbins, and five other alleged members of the Gangster Disciples street and prison gang (Doc. 1).

(Count 11), use of a firearm during and in relation to a crime of violence (Count 12), and use of a firearm during and in relation to a crime of violence causing death (Count 13).

As is relevant to the instant motion, the Superseding Indictment alleges that Dobbins and Griffin were leaders in the gang (each was allegedly a "board member") and murdered Ernest Wilson in Chicago, Illinois on May 18, 2018. Wilson is also alleged to have been a leader within the Gangster Disciples. The Government contends that Wilson was an obstacle to Defendants' desire to advance within the organization.

The Government contends that circumstantial evidence, in conjunction with video surveillance, will show that Dobbins and Griffin worked together to kill Wilson. According to the Government, video surveillance from the day of the shooting shows two suspects (Suspect One and Suspect Two) involved in shooting Ernest Wilson at the intersection of 71st Street and Euclid Avenue in Chicago, Illinois, at approximately 11:35 p.m. Suspect Two allegedly shot himself by accident. The suspects then ran to and entered a white SUV that was parked on a nearby street corner. The government intends to prove at trial that Suspect One is Warren Griffin and Suspect Two is Anthony Dobbins.

## II.   MOTIONS TO SUPPRESS

### A.   Dobbins' Motion to Suppress (Doc. 494 and Supplemental Briefing at Docs. 617 and 623)

In his motion, Dobbins moves to suppress all evidence obtained as a result of the execution of six[2] search warrants issued in this case based on lack of probable cause. The

---

[2] In his Motion to Suppress, Dobbins mentions an application for search warrant filed on August 16, 2018 (Doc. 494, p. 3). However, the Motion indicates that counsel did not receive an Order signed by any Court regarding this application. This application was not provided to the Court and no further argument has been presented regarding the August 16 Affidavit.

first warrant was issued on June 29, 2018 for records pertaining to a cellular number allegedly used by Dobbins (cell number ending in 7988). Dobbins contends that the affidavit in support of this warrant (June 29 Affidavit) (Doc. 600-1) is lacking in probable cause because, *inter alia*, it contains an inaccurate description of the Wilson Video. Dobbins claims that three subsequently procured search warrants, including the Cadillac GPS Warrant (Doc. 600-3), are also void because they contain the same false statements about the Wilson Video and/or because they are fruits of the June 29 Affidavit.[3] Dobbins also seeks to suppress evidence seized in connection with two subsequently issued search warrants because they are fruits of the June 29 Affidavit (but admits that the affidavits in support of these warrants did *not* contain any false statements).[4]

In Dobbins' Motion to Suppress (Doc. 494), Dobbins alleges that the June 29 Affidavit contained five "inaccurate facts," that resulted in a finding of probable cause:

1. Two suspects exited the SUV, walked north toward 79th Street on Euclid Avenue, and entered an alley where Ernest Wilson was believed to be in his vehicle. Suspect 1 and Ernest Wilson exited the alley while suspect 2 remained in the alley for a short time before exiting. Suspect 1 and Ernest Wilson walked back together towards

---

[3] In addition to the June 29 Warrant, Dobbins claims the following warrants contain false statements about the Wilson Video:

(1) July 11, 2018 Warrant based on an affidavit by affiant Rob Honnet for a GPS tracking device and (Doc. 600-3) ("Cadillac GPS Warrant");

(2) July 11, 2018 Warrant based on an affidavit by affiant Rob Honnet for information and records pertaining to the location of the cellular telephone ending in 7988 (Doc. 600-2) ("July 11 7988 Cell Warrant");

(3) August 13, 2018 Warrant based on an affidavit by affiant Ikedinachi Akagha for an LG Cell Phone (Doc. 604-6) ("August 13 LG Cell Phone Warrant").

[4] Dobbins indicates that the following warrants do *not* contain any false statements but are void as fruits of the poisonous tree:

(1) August 10, 2018 Search Warrant based on an affidavit by affiant Chad Uhl for Dobbins' residence (Doc. 604-4) ("August 10 Premises Warrant"); and

(2) August 10, 2022 Search Warrant based on an affidavit by affiant Chad Uhl for Dobbins' white 2006 Cadillac Escalade (Doc. 604-5) ("August 10 Cadillac Warrant").

the direction of the intersection of 71st and Euclid Avenue. Suspect 2 appeared from the alleyway and walked towards suspect 1 and Ernest Wilson who were both standing on the corner of 71st and Euclid Avenue. Suspect 2 fired several shots killing Ernest Wilson. Based on the video footage, the government identified suspect 1 to be Warren Griffin and suspect 2 to be Anthony Dobbins;

2.  While suspect 2 un-holstered his firearm, he discharged a round into himself, limped towards a white SUV, entered the passenger side of the SUV, and left the crime scene;

3.  The government identified the white SUV depicted in the video recording of Ernest Wilson's murder as belonging to Anthony Dobbins;

4.  Ernest Wilson was shot two times in the head and two times in the back; and

5.  five rounds were shot into Ernest Wilson's body.

(Doc. 494, pp. 3-4).

According to Dobbins, the above listed averments are provably false because the Wilson Video is of such poor quality that it is "impossible to identify either Warren Griffin or Anthony Dobbins walking in or out of an alleyway," "impossible to identify the suspects," and because the SUV spotted near the murder scene "could not be identified as a vehicle driven by, or belonging to, Anthony Dobbins." (Doc. 494, p. 5). *See also* (Doc. 494, p. 6) ("Identifying Ernest Wilson's shooter as Anthony Dobbins is a material misstatement and it is not supported by the only video footage of the murder provided to the defense….And, stating that the vehicle near the Ernest Wilson murder scene belonged to Anthony Dobbins without being able to identify the make and model of the vehicle or the license plate number is a false material statement."). Dobbins also claims that the video does not depict one of the suspects shooting himself, and that the

6

claims regarding the number of shots fired and where Wilson was shot are inconsistent with the medical examiner's report (Doc. 494, p. 5).

In his supplemental briefing (Doc. 623), Dobbins claims that the following averments are false:

1. The claim that Dobbins and Griffin were associated with significant strife among members of the Gangster Disciples, including Dushawn Wharton.

2. The claim that Larry Hoover designated Dobbins and Griffin as board members during the time that Dobbins was housed at ADX with Larry Hoover.

3. The claim that Dobbins and Griffin were responsible for managing criminal activities for all of the Gangster Disciple members in the state of Missouri and Southern Illinois from March 2018 until June 29, 2018.

4. The claim that Dobbins and Griffin managed strategies in the Chicago area that were directly opposed to gangster members.

5. The claim that the investigative team was aware that the management strategies of Dobbins and Griffin are in direct opposition to the wishes of established Gangster Disciple board members residing in Chicago, including Ernest Wilson.

6. The claim that there was probable cause to believe that the white full-size SUV in the video recording of the Wilson Video was Dobbins' white 2006 Cadillac Escalade.

7. The claim that the shooter in the Wilson Video attempted to re-holster his firearm as Wilson fell to the ground, by placing the gun back in his waistband.

8. While unholstering the firearm, the shooter discharged a round into himself.

9. The claim that a telephone conversation between Anthony Robinson and an inmate at Statesville Correctional Center on May 20, 2018 discussed three unidentified males arriving in a white truck who were responsible for Wilson's murder.

10. The claim that Clarence Michel is a criminal coconspirator of Warren Griffin who landed a plain in Cahokia, Illinois on May 18, 2018 between the hours of 10:00 a.m. and noon.

(Doc. 623, pp. 3-8).

**B.     Griffin's Motions to Suppress (Docs. 464 and 465)**

In Griffin's First and Second Motion to Suppress (Docs. 464 and 465), he seeks to suppress all evidence seized as a result of the Cadillac GPS Warrant (Doc. 600-3). He also seeks to suppress all evidence seized as a result of two warrants for records pertaining a cellular telephone ending in 9807 (Docs. 604-1 and 604-2) and one warrant for records pertaining to four cellular telephones allegedly being used by Griffin (Doc. 604-3). In his motions, Griffin generally alleges that the disputed affidavits are lacking in probable cause and allege insufficient facts to support utilization of GPS tracking. (Docs. 464 and 465). Griffin further alleges that the affidavits contain a misdescription of the Wilson Video and that they are internally inconsistent "when asserting that Mr. Griffin committed acts in furtherance of a national Gangster Disciple RICO conspiracy but also at the same time contrary to the wishes and aims of the national Gangster Disciples." (Doc. 464, p. 8).

### III.     Evidentiary Hearing – Procedural Matters

In its responsive briefing, the Government stated that, although it did not believe Defendants made a sufficient threshold showing to justify a *Franks* hearing,[5] the Court could not resolve the motions without reviewing the Wilson Video. Accordingly, the

---

[5] A *Franks* hearing is an evidentiary hearing regarding the veracity of information included in a search warrant application. *See Franks v. Delaware*, 438 U.S. 154 (1978). "To obtain a *Franks* hearing, the defendant must make a 'substantial preliminary showing' of (1) a material falsity or omission that would alter the probable cause determination, and (2) a deliberate or reckless disregard for the truth." *United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014)) (citing *McMurtrey*, 704 F.3d at 508). "*Franks* hearings are 'rarely held' because '[t]hese elements are hard to prove.'" *United States v. Dessart*, 823 F.3d 395, 402 (7th Cir. 2016), *quoting United States v. Swanson*, 210 F.3d 788, 790 (7th Cir. 2000).

Government stipulated to an evidentiary hearing for the "narrow" purpose of producing the video to the Court. Considering the Seventh Circuit's decision in *United States v. McMurtrey*, 704 F.3d 502, 509 (7th Cir. 2013), which explained that "pre-*Franks*" hearings become problematic when the Government is allowed to present evidence without affording the defense a full opportunity for cross-examination, the Court declined to proceed with a "narrow" evidentiary hearing that would only allow for the Government to produce the video to the Court.[6] Rather, on November 15, 2022, the Court held an evidentiary hearing and, with the agreement of the parties, proceeded to hold a full *Franks* hearing. (Doc. 617, pp. 4-7).

During the hearing, the defense was allowed to supplement its original submissions by introducing evidence and calling witnesses. Dobbins called Special Agent Rob Honnet ("Honnet"). Honnet was the affiant for June 29 Affidavit (Doc. 600-1). He was also the affiant for (1) the Cadillac GPS Warrant (Doc. 600-3) (challenged by both Dobbins and Griffin), (2) the July 11 7988 Cell Warrant (Doc. 600-2) (challenged by

---

[6] The Seventh Circuit recently summarized its holding in *McMurtrey*, explaining as follows:

> When a defendant seeks a *Franks* hearing it can be difficult to delineate between sufficient and insufficient showings. In *McMurtrey*, we recognized that district courts sometimes resort to "pre-Franks" hearings to enable defendants to supplement or elaborate on their original submissions. The focus of such a pre-*Franks* hearing is to determine whether the preliminary showing could be met. We held in *McMurtrey* that "[s]uch hearings are well within a district court's discretion to aid it in making a sound decision on whether to hold a full *Franks* hearing." *In McMurtrey*, we noted that pre-*Franks* hearings may be problematic if the government is allowed to present new evidence but the defense is not afforded a full opportunity for cross-examination.

*United States v. Sanford*, 35 F.4th 595, 598 (7th Cir. 2022) (cleaned up). Here, the Defendants were allowed a full opportunity not only to cross examine the Government's witness, but also to present evidence in support of their motions to suppress.

Dobbins); (3) the August 13 LG Cell Phone Warrant (Doc. 604-6) (challenged by Dobbins); (4) the July 11 9807 Cell Warrant (Doc. 604-1) (challenged by Griffin); and (5) July 20 9807 Cell Warrant (Doc. 604-2) (challenged by Griffin).[7] Counsel for Griffin did not call any witnesses, but he was given an opportunity to cross examine Honnet. (Doc. 617, pp. 73-76). The Government called one witness, Sergeant Nick Homann ("Homann"), an investigator with the Illinois State Police familiar with the disputed warrants. (Doc. 617, pp. 76-132). Defense counsel was given a full opportunity to cross-examine Homann. (Doc. 617, pp. 106-132).

The Court held an evidentiary hearing on November 16, 2022 (Doc. 636) addressing several pretrial motions, including Griffin's First Motion to Suppress (Doc. 465). With regard to Griffin's First Motion to Suppress, the November 16, 2022 hearing addressed his arguments as to wiretap affidavits. During the November 16, 2022 hearing, after inquiries by the Court to address any confusion on the matter, the parties agreed that the arguments in Griffin's First Motion to Suppress (Doc. 465) pertaining to the truthfulness and lack of probable cause for the Cadillac GPS Warrant (Doc. 600-3); the July 11 9807 Cell Warrant (Doc. 604-1), and the July 20 9807 Cell Warrant (Doc. 604-2) were addressed during the November 15, 2022 hearing (Doc. 136 pp. 74-75, 102-104).[8] At

---

[7] As previously stated, Dobbins is also challenging the August 15 search warrant for 4 cell phones allegedly belonging to Griffin (Doc. 604-3). The affiant for this search warrant was Ikedinachi Agagha, a special agent with the FBI. Agagha was not called to testify by either party.

[8] Griffin's Second Motion to Suppress (set for hearing on November 15, 2022) and First Motion to Suppress (set for hearing on November 16, 2022) both contain argument regarding alleged falsies in the Cadillac GPS Warrant (Doc. 600-3); the July 11 9807 Cell Warrant (Doc. 604-1), and the July 20 9807 Cell Warrant (Doc. 604-2). The alleged issues in these warrants pertained to the description of the Wilson Video and/or their connection to the disputed June 29 Affidavit. Honnet was the affiant for these affidavits. Dobbins called Honnet to testify on November 15, 2022, and Griffin's counsel was given an opportunity to question him at that time. To the extent there was any confusion as to when Griffin's arguments as to these affidavits

the request of the parties, the Court further indicated that, to the extent there was any overlap, the Court would consider all material presented by the parties on November 15 and November 16. (Doc. 636, pp. 102-104). Finally, counsel for Griffin confirmed that the Court had "given [him] every opportunity to talk about witnesses and to do whatever [they] needed to do." (Doc. 636, p. 104).

#### IV.   SEARCH WARRANT AFFIDAVIT

As previously noted, Rob Honnet, Special Agent with the Drug Enforcement Administration ("DEA"), was the affiant of the June 29 Affidavit (Doc. 600-1). The June 29 Affidavit is the earliest issued affidavit at issue in this case. To the extent that affidavits supporting the subsequently procured warrants are contested, it is because they contain the same language regarding the Wilson Video[9] and/or because they are fruits of the June 29 Affidavit. Accordingly, for purposes of this Order, the Court limits its discussion to the averments contained in the June 29 Affidavit.

---

would be addressed, Griffin could have but did not call Honnet to testify at the November 16, 2022 hearing. (*see* (Docs. 570 and 573) (the parties were given the opportunity to request oral argument as to each pretrial motion and to specify whether they would be calling any witnesses, Griffin elected not to call witnesses as to any of his motions set for oral argument); (Doc. 568) (the Government also provided notice as to any witnesses it would be calling as to each motion). Further, as previously noted, the Court made inquires during the November 16 2022 hearing, and counsel agreed that Griffin was given every opportunity to address these arguments.

[9] The language describing the Wilson Video varies in some of the subject affidavits. The variance, however, is not substantive.

The following is a summary of the averments in the June 29 Affidavit:[10]

*Paragraphs 2 and 3*

Honnet has been employed by DEA since February 2017, and is assigned to the St. Louis Division, where he investigates violent crimes, including murders, robberies, and assaults conducted by violent criminal drug trafficking organizations. The affidavit is made on personal observations, training and experience, and information obtained from other agents, witnesses, Confidential Sources ("CS's), and Sources of Information ("SOI's).

*Paragraph 5*

The DEA, the Bureau of Alcohol, Tobacco and Firearms, the Federal Bureau of Investigation, the Illinois State Police, and numerous other law enforcement agencies (collectively referred to as "agents" or "the investigative team") have been "conducting an ongoing investigation of several members of the Gangster Disciples engaged in criminal activity in the Southern District of Illinois and elsewhere." The investigation has revealed that there is "significant strife among members of the Gangster Disciples regarding changes in leadership within the gang."

*Paragraph 6*

The conflict resulted in the murder of Gangster Disciples member Leroy Allen and the attempted murder of Gangster Disciples member Dushawn Wharton (a/k/a

---

[10] The June 29 Affidavit speaks for itself and is available in its entirety at Doc. 600-1. The Court does not restate the affidavit verbatim in this order. Material that is not in quotations or block quotes has been summarized by the undersigned.

Assassin)) on April 28, 2018. Wharton was targeted because he would not agree to step

down from his position in the St. Louis leadership of the Gangster Disciples.

### *Paragraph 7*

On May 18, 2018 at approximately 11:35 p.m., Ernest Wilson (a/k/a Don Smokey), a known Gangster Disciple leader in the Chicago area, was murdered at 7159 S. Euclid Avenue in Chicago, Illinois. Wilson was shot two times in the head and two times in the back.

### *Paragraph 8*

Griffin is a Gangster Disciple board member "who operates in conjunction with"

Dobbins, who is also a Gangster Disciple board member. During the relevant time period,

Dobbins was on supervised release, and as a condition of his supervised release, he was

not allowed to travel outside the Southern District of Illinois without prior authorization

from the Court. He had not sought nor received permission to travel outside the Southern

District of Illinois since being placed on supervised release.

### *Paragraph 9*

Honnet is aware "through conversations with agents and investigators from the

Federal Bureau of Investigation (FBI) and the Federal Bureau of Prisons (BOP), both of

whom have conducted long-term investigations into the Gangster Disciples national

hierarchy structure" of the following information:

Dobbins has repeatedly maintained that while he was incarcerated with Gangster Disciple National Leader Larry Hoover in BOP ADX Florence that Hoover promoted Dobbins to the rank of board member and that Hoover had also promoted Griffin to the position of board member. Upon their promotion, Griffin and Dobbins are responsible for managing the criminal activities for all Gangster Disciple members operating in Missouri and

13

Southern Illinois. This information is based upon the FBI and BOP monitoring of communications (from the time period of August 13, 2014 to October 20, 2017) between Dobbins and Griffin while Dobbins was incarcerated in the Bureau of Prisons. The investigative team is aware that the management strategies of Dobbins and Griffin are in direct opposition to the wishes of established Gangster Disciple board members residing in Chicago, one of these opposing members having been Wilson.

*Paragraph 10*

The investigative team is also aware that during a recorded conversation

with a confidential human source on January 12, 2017, when discussing the list of

board members that came from "the Old Man" (Hoover) and those who were not

on "the list," Griffin stated that the first order of business is "Assassin" (Wharton)

and that he has to get out of the way.

*Paragraph 11*

A video camera located in the area of 7159 S. Euclid Avenue in Chicago, Illinois captured the murder of Wilson. The video surveillance footage, seized and secured by the Chicago Police Department, depicts a full-size white SUV parking near the murder scene and two individuals exiting the white SUV and walking north toward 79th street on Euclid Avenue. Both individuals are observed entering an alley located near the intersection of Euclid and 79th. It is believed that at the time Wilson was residing in his vehicle, which was parked in the alley. A short time later, one of the individuals (hereinafter Suspect 1) and Wilson are observed exiting the alley while in conversation. Suspect 1 and Wilson are seen walking and conversing on Euclid while the second individual (hereinafter Suspect 2) remains in the alley. Suspect 2 is then observed exiting the alley, walking south on Euclid, and then observed walking toward Wilson. As suspect 2 walks towards Wilson, Suspect 1 walks toward the driver's side of the white SUV. Upon reaching Wilson, Suspect 2 opens fire on Wilson, and then attempts to re-holster his firearm as Wilson falls. Upon Wilson falling to the ground Suspect 2 un-holsters his firearm. It appears from the video that Suspect 2 discharged a round into himself while un-holstering his firearm and then fires additional rounds into Wilson's body. Suspect 2 then limps

14

toward the white SUV and enters the passenger side and the white SUV departs the scene.

### Paragraph 12

The affiant indicated that intercepts of phone conversations from the Illinois Department of Corrections revealed that on May 20, 2018, an inmate at Statesville Correctional Facility (a renounced Gangster Disciples leader) placed a call to Anthony Robinson (a current Gangster Disciples leader in Chicago, Illinois). During the conversation, Robinson confirmed that on May 18, 2018, Wilson was murdered outside of his residence. Additionally:

> Robinson sated that he had discussed the murder with other known members of the Gangster Disciples and was told that Wilson was shot five times, including being shot in the face. Robinson also stated that he was informed that three unidentified males who arrived in a white truck were involved in the shooting.

### Paragraph 13

> On May 20, 2018, at approximately 8:30 a.m., Dobbins walked into the emergency room of St. Elizabeth's Hospital, located in O'Fallon, Illinois, seeking treatment for a through and through gunshot wound, which entered his left leg near the groin and exited above his knee in the back of his leg.

### Paragraph 14

While receiving treatment, Dobbins was informed that law enforcement was in route to speak with him regarding his injury. Dobbins left the hospital prior to law enforcement arriving. Law enforcement subsequently contacted Dobbins using the cellular telephone number he had provided to various individuals as being his contact number (the same phone number that was the "target" cellular phone number for the

June 29 affidavit and warrant). During the conversation, Dobbins told law enforcement that he was in East St. Louis on May 19, 2018, at approximately 1:00 a.m. when he was approached by a "drug addict" who attempted to rob him and shot him in the leg. Dobbins further stated that he did not know the assailant and did not wish to file a police report.

### Paragraph 15

Video surveillance from St. Elizabeth's Hospital on May 20, 2018, shows Dobbins arriving in a white Cadillac Escalade, bearing Illinois license plate number 2336250B (at the time, the Cadillac was being driven by an unknown female), and a database query revealed that the vehicle was registered to Dobbins.

### Paragraph 16

Police inquiries of Illinois license number 2336250B returned information that on May 19, 2018 at approximately 12:26 a.m. a Dolton Police Department Officer requested registration information for the aforementioned license number. Dolton, Illinois is located approximately 25-30 minutes south of the location of where Wilson was murdered approximately one hour earlier on S. Euclid Avenue in Chicago, Illinois.

### Paragraph 17

A search of the Illinois Tollway online database revealed that on May 18, 2018 at approximately 7:31 p.m. Dobbins' white Cadillac Escalade, bearing Illinois license number 2336250B, passed through an eastbound tollbooth, located near the intersection of Interstate 294 and 163rd street, in Markham, Illinois, without paying a toll. Investigators were able to acquire a photo of

16

Dobbins' vehicle, bearing Illinois license number 2336250B, passing through the aforementioned tollbooth from the Illinois Tollway online database.

*Paragraph 18*

A check of an open source database, TLO, returned no subscriber information for phone number 618-570-7988 but indicated that the number is being utilized on the VERIZON network.

*Paragraph 19*

The investigation has also revealed that on May 18, 2018 at approximately 10:00 a.m., a jet plane owned by Clarence "C.J." Michel landed at the St. Louis Downtown airport in Cahokia, Illinois and remained there until it departed at approximately noon on May 20, 2018. Your affiant is aware that Clarence "C.J." Michel is a criminal co-conspirator of Griffin, who is pending federal indictment with Griffin for tax evasion related charges in the Eastern District of Kentucky. The St. Louis Downtown airport does not require pilots to provide any information regarding the names of any passengers or contents of the planes utilizing the airport.

*Paragraph 20*

Based on the facts stated, there is probable cause to believe that Dobbins traveled from the Southern District of Illinois to Chicago, Illinois on May 18, 2018 and was therefore out of the southern District of Illinois without prior judicial travel approval in violation of the conditions of his supervised release. There is also probable cause to believe that Dobbins was in the vicinity of Euclid Avenue in Chicago, Illinois near the time when fellow Gangster Disciple member and leader Ernest Wilson was murdered and that the white full-size SUV depicted in the video recording of the murder of Wilson is Dobbins' white 2006 Cadillac Escalade bearing Illinois license number 2336250B. Further, this affidavit establishes that Dobbins is the user of the Target Telephone and that there is probable cause to believe that the historic cell tower location information...would lead to the identification of the location of the user of the Target Telephone at the time crimes were committed and will constitute evidence that violent crimes and violations of 18 U.S.C. § 1959 have been committed by the user of the Target Telephone.

### V.   TESTIMONY AND EVIDENCE REGARDING THE DISPUTED AFFIDAVITS

This Court heard testimony from Agent Rob Honnet and Sergeant Homann. The parties also introduced evidence, including three video clips. A brief summary of relevant testimony[11] and evidence is included below.

### A.   Rob Honnet

#### 1.   Direct Examination by Dobbins' Attorney[12]

Honnet testified that the information in the June 29 Affidavit was gathered from speaking with other law enforcement officers, witnesses, and sources of information.[13] He also reviewed the Wilson Video and, after communicating with FBI agents in Chicago, included a description of the video in his affidavit.

Honnet confirmed that various law enforcement agents provided him with information indicating that there was strife within the Gangster Disciples, that there was a nationwide split between Gangster Disciples leaders in the North and the South, that Dobbins was claiming that Larry Hoover designated himself and Griffin as being Gangster Disciples board members, that Dobbins was claiming he and Griffin were responsible for managing criminal activities for all Gangster Disciples members in Missouri and Southern Illinois, and that Dobbins and Griffin were engaged in

---

[11] Griffin's counsel questioned Honnet (Doc. 617, pp. 73-74, 76) and Homann (Doc. 617, pp. 106-12). His examination of these witnesses, however, did not elicit any testimony necessary to the Court's ruling on the instant motions. Accordingly, it is not summarized here.

[12] Doc. 617, pp. 7- 43.

[13] According to Honnet, sources of information refers to "information passed to [him] by other agents who had sources of information that provided that information to them." (Doc. 617, p. 11).

management strategies that directly opposed Gangster Disciples leaders operating in Chicago, Illinois, including Ernest Wilson.

Honnet could not provide specific examples of Dobbins' and Griffin's management activities in Missouri and Southern Illinois or of any disputes between them and other leadership in Chicago, Illinois. He further indicated that he obtained the information from other law enforcement agents and could not speak to their sources of information. He also indicated that he did not personally confirm information provided to him by other members of law enforcement.

Dobbins' counsel then played the Wilson Video.[14] After watching the video, Honnet testified that he observed a full size, white SUV. Honnet clarified that, in his affidavit, he never identified the suspect vehicle as being Dobbins' white Cadillac Escalade. Instead, he identified the suspect vehicle as being a full size, white, SUV and averred that, given the totality of the information obtained by law enforcement, there was probable cause to believe that the suspect vehicle was Dobbins' white Cadillac Escalade.[15] Honnet also indicated that he believes he was mistaken when he averred that the shooter in the video attempted to "re-holster" his gun prior to accidentally shooting himself. Instead, Honnet stated that, after rewatching the video, he believes the following is correct:

> There was never a re-holster prior to unholstering and shooting. It was four separate shots followed by an attempt to holster. You can see the muzzle flash go off as [the shooter] puts whatever gun they had between their legs.

---

[14] Defense Exhibit A, manually filed with the Court.

[15] Honnet also reviewed the affidavits supporting the warrants issued on July 11, confirming that they contained many of the same averments included in the June 29 Affidavit, including the same description of the Wilson Video.

(Doc. 617, p. 24). During direct examination, Honnet referred to this mistake as a

"clerical error."

### 2.    Cross Examination by the Government[16]

During cross examination, the Government again questioned Honnet regarding

his description of the Wilson Video:

> Q.  In this affidavit on paragraph 11 there's a description of a video that purportedly depicts Mr. Wilson's murder. We discussed that on your direct examination. Do you remember that?
> A.  Yes, Sir.
> Q.  In that description of the video did you say that you were able to identify the license plate of that vehicle?
> A.  No, I did not.
> Q.  Did you say that you were able to identify from that video Mr. Dobbins or Mr. Griffin?
> A.  No, I did not.
> Q.  The later section of the affidavit where you say there was probable cause to believe that that was Mr. Dobbins' Escalade, was that based on the video or was that based on the totality of the investigation?
> A.  Totality of the investigation, sir.

(Doc. 617, pp. 53-54).

The Government also questioned Honnet regarding what he initially described as

a "clerical error" in his description of the Wilson Video:

> Q.  Agent Honnet, have you had the opportunity to recently review the description of the video that is in the affidavit?
> A.  Yes, I have.
> Q.  And you explained on direct examination that you referred to it as a clerical error, but was that an unintentional misstatement about the order of events in the video. Is that what you were referring to?
> A.  Yes, sir, unintentional misstatement.
> Q.  Were there any intentional misstatements in your description of the video that was in the affidavit?

---

[16]  Doc. 617, pp. 43 – 69.

A. No, Sir, there was not.

Q. And do you stand by your statement that Mr. Dobbins or the individual in the video, suspect two, appears to shoot himself in the leg during the video?

A. Yes, sir, I do.

Q.  Do you stand by the statement that he limps noticeably as he hobbles back to the Cadillac Escalade in the video?

A. Yes, sir, I do.

Q.  And did the order of the shots, whether it was before or after unholstering his firearm, did that affect your investigation in any way?

A.  No, sir, it did not.

(Doc. 617, pp. 59-60).

The Government next questioned Honnet about footage taken from a Ring Camera in the vicinity of the shooting (Defense Exhibit F, manually filed with the Court).[17]  In the video, the shooting is not visible, but audio of a gun being fired can be heard. Agent Honnet testified that, in the video, he could hear five separate shots being fired.

---

[17] Agent Honnet did not watch the Ring Camera Video prior to submitting the June 29 Affidavit. Because of this, the Court concluded that the video was not relevant to the question of probable cause. *See United States v. Rees*, 957 F.3d 761, 765-66 (7th Cir. 2020) (in assessing whether a magistrate had a substantial basis to conclude that probable cause existed, matters outside the affidavit are not considered). The Government, however, argued that the video was relevant to the question of whether the June 29 Affidavit contained an intentional misrepresentation:

> Ms. Thompson has argued in her motion that Mr. Dobbins did not, in fact, shoot himself on the video, that it doesn't depict him shooting himself. There is evidence in the form of this Ring cameral footage that there were five shots, that there were five shots that were fired on that night when Mr. Wilson was shot. Now, the medical examiner's report says that there were four shots – that there were four shotgun wounds to Mr. Wilson. So if, in fact, there were five shots, that corroborates that the video appears to depict and what the probable cause affidavit suggests that the video depicts is that Mr. Dobbins shoots himself in the leg. It would also explain this apparent discrepancy that Ms. Thompson is focused on where there was this jail call was recorded where this informant says that he heard that [Wilson] was shot and he was shot five times.

(Doc. 617, p. 55). The Court allowed the testimony on this basis. *See Rainsberger v. Benner*, 913 F.3d 640, 650 n.5 (when assessing matters other than probable cause, such as whether a search warrant affidavit contains knowingly or recklessly false information, extrinsic evidence is properly considered).

Finally, the Government played the Wilson Video a second time. This time, however, the Government magnified the video.[18] After reviewing the magnified version of the Wilson Video, Agent Honnet testified as follows:

> Q. [B]ased on viewing that clip, do you still stand by the statement that it appears that suspect two shoots himself during this encounter?
> A. Yes, sir, I do.
> Q. Do you still stand by the statement that he limps back to the vehicle after shooting Mr. Wilson?
> A. Yes, sir, I do.

(Doc. 617, p. 62).

### 3.      Redirect Examination by Dobbins' Counsel[19]

During redirect examination, Dobbins' counsel played another video clip for Agent Honnet (Defense Exhibit E, manually filed with the Court). In the video, taken on the same night as the Wilson Video and apparently obtained by law enforcement in Chicago, Illinois, two individuals can be seen walking in an alleyway. Agent Honnet testified that he had never seen the video before.

### B.      Master Sergeant Nick Homann

---

[18]  Dobbins' counsel objected to playing an "enhanced" version of the Wilson Video. The Government explained that the video was not enhanced. Rather, the Government loaded the Wilson Video into a software program known as Trial Director, which allows users to enlarge (but not enhance) videos. The Court likened the enlargement to using a magnifying glass to look at a photograph and overruled the objection. Dobbins' counsel also objected because Agent Honnet did not review the enlarged version of the Wilson Video prior to drafting the June 29 Affidavit. However, as previously noted, extrinsic evidence is properly considered during a *Franks* inquiry when assessing the veracity of statements in a search warrant affidavit.

[19]  Doc. 617, pp. 69 – 73. Sergeant Homann also offered testimony regarding a motion that is not being addressed in this order. That portion of his testimony is not discussed herein.

The Government called Master Sergeant Nick Homann. Sergeant Homann was not an affiant for any of the disputed search warrant affidavits.[20] However, he was a lead investigator in the case, and he was aware of the contents of the disputed affidavits. Sergeant Homann's testimony was introduced with respect to the first step in the *Franks* inquiry – whether any of the affidavits contained intentional or reckless misrepresentations (Doc. 617, pp. 81-85).

### 1.    Direct Examination by the Government[21]

Sergeant Homann testified that he was familiar with the June 29 Affidavit, the subsequently issued search warrant affidavits, and the Wilson Video. In Sergeant Homann's opinion, the disputed search warrant affidavits do not contain any intentional misstatements and accurately describe the Wilson Video. Further, Sergeant Homann testified that the August 10, 2018 search warrant affidavits pertaining to Dobbins' home and vehicle did not include a description of the Wilson Video. Rather, these warrants were obtained following Dobbins' arrest at his residence – the basis for probable cause was Dobbins' attempt to dispose of narcotics when officers were entering his residence.

### 2.    Cross-Examination by Dobbins Attorney[22]

During cross-examination, Dobbins' attorney played the video of two individuals walking in an alleyway (Defense Exhibit E). Sergeant Homann indicated that he was familiar with the video and stated that the video footage was taken prior to Wilson's

---

[20]  Sergeant Homann is an Illinois State Police Officer (Doc. 617, pp. 87, 93). Accordingly, by law, he is not permitted to be an affiant on a federal search warrant. *Id.*

[21]  Doc. 617, pp. 81 – 105.

[22]  Doc. 617, pp. 113-132. Griffin's attorney was given an opportunity to cross-examine Sergeant Homann, but he declined to do so (Doc. 617, p. 132).

homicide. Sergeant Homann was unable to testify as to whether one of the individuals in the video was walking with a limp. Next, Dobbins' attorney played the Ring Camera Video (Defense Exhibit F). Sergeant Homann testified that, upon reviewing the video, he could hear five gunshots.

## VI.   APPLICABLE LAW

To suppress evidence seized pursuant to a search warrant, the defendant must prove by a preponderance of the evidence "that (1) the affidavit in support of the warrant contains false statements or misleading omissions, (2) the false statements or omissions were made deliberately or with reckless disregard for the truth, and (3) probable cause would not have existed without the false statements and/or omissions." *United States v. Williams*, 718 F.3d 644, 647 (7th Cir. 2013).

"A search warrant affidavit establishes probable cause when it sets forth facts sufficient to induce a reasonably prudent person to believe that a search thereof will uncover evidence of a crime." *United States v. Gregory*, 795 F.3d 735, 741 (7th Cir. 2015) (citation omitted). When assessing whether a magistrate judge had a substantial basis to conclude that probable cause existed, the court "look[s] only at the information the magistrate had." *United States v. Rees*, 957 F.3d 761, 765 (7th Cir. 2020). Thus, where the issuance of a search warrant is based entirely on an affidavit, like in this case, "the validity of the warrant depends solely on the strength of the affidavit." *United States v. Johnson*, 867 F.3d 737, 741 (7th Cir. 2017) (citing *United States v. Carson*, 582 F.3d 827, 831-32 (7th Cir. 2009)).

There is, however, an important qualification to this rule: In assessing whether a search warrant affidavit contains knowingly or recklessly false information, extrinsic evidence may properly be considered. *See United States v. Rees*, 957 F.3d 761, 766 (7th Cir. 2020). ("while a district court may not consider new inculpatory information supporting a finding of probable cause—the court may (and at times must) consider new information attacking the veracity of the warrant affidavit or on issues outside whether probable cause existed."); *Rainsberger v. Benner*, 913 F.3d 640, 650 n.5 (7th Cir. 2019) (extrinsic evidence may be considered, for example, on the issue of "whether an officer acted knowingly or recklessly when he prepared the affidavit."). Such extrinsic evidence must, however, be confined to its proper purpose. It is admissible only "with respect to an issue *other than* whether the warrant demonstrates probable cause." *Rainsberger*, 913 F.3d at 650 n.5 (emphasis added).

Therefore, in the instant case, extrinsic evidence cannot be used to bolster the Government's showing of probable cause, which must be based on the subject affidavits (as redacted to remove any knowingly or recklessly false statements). But extrinsic evidence may be considered when assessing whether the subject affidavits contained intentional or reckless falsities.

## VII.   ANALYSIS

### *The June 29 Affidavit*

**A.   Material Falsity**

**1.      Identification of Vehicle and Suspects in the Wilson Video**

In his Motion to Suppress, Dobbins claims that, in the June 29 Affidavit, based on the Wilson Video footage, "the government identified suspect 1 to be Warren Griffin and suspect 2 to be Anthony Dobbins." (Doc. 494, p. 3). In addition, Dobbins claims that, in the June 29 Affidavit, "the government identified the white SUV depicted in the video recording of Ernest Wilson's murder as belonging to Anthony Dobbins." The Motion to Suppress goes on to explain why any such identification is verifiably false:

> [I]t is impossible to identify either Warren Griffin or Anthony Dobbins walking in or out of an alleyway in the video footage of Ernest Wilson's murder in Chicago. Ernest Wilson's murder occurred at approximately 11:35 pm. on a dark and rainy evening. The video footage was black and white, and the camera depicting the shooting was approximately 1/2 block to one block away from the crime scene. The video footage makes it impossible to identify the suspects…A light-colored SUV was spotted near the murder scene, but it could not be identified as a vehicle driven by, or belonging to, Anthony Dobbins.

(Doc. 494, p. 5).

Counsel's representations in Dobbins' Motion to Suppress led the Court to believe that the June 29 Affidavit positively identified the suspects in the Wilson Video as being Dobbins and Griffin and positively identified the vehicle depicted in the video as belonging to Dobbins. Considering counsel's additional claims that the video was of such poor quality it was impossible to identify either suspect or the vehicle, the Court was concerned that the June 29 Affidavit, and the affidavits supporting the subsequently issued warrants which contained the same description of the Wilson Video, did in fact contain verifiably false information.[23] However, upon reviewing the June 29 Affidavit

---

[23] Counsel did not produce the subject affidavits until the day of the hearing.

(and the other disputed affidavits), despite counsel's representations to this Court in the

Motion to Suppress,[24] it is clear that Honnet, never averred that he – or anyone involved

in the investigation – had identified the suspects in the video as being Dobbins and Griffin

or the vehicle in the video as being Dobbins' Cadillac Escalade. Rather, the June 29

Affidavit details the information law enforcement had gathered to date during its

investigation. After reviewing the information obtained during the investigation, Honnet

states that, given this information, "there is probable cause to believe" that:

> Dobbins traveled from the Southern District of Illinois to Chicago, Illinois
> on May 18, 2018, and was therefore out of the Southern District of Illinois
> without prior judicial travel approval in violation of the conditions of his
> supervised release. There is also probable cause to believe that Dobbins was
> in the vicinity of Euclid Avenue in Chicago, Illinois near the time when
> fellow Gangster Disciple member and leader Ernest Wilson was murdered
> and that the white full-size SUV depicted in the video recording of the
> murder of Wilson is Dobbins' white 2006 Cadillac Escalade…

(Doc. 600-1, p. 7). This is a far cry from "identify[ing] the white SUV depicted in the video

recording of Ernest Wilson's murder as belonging to Anthony Dobbins," and in no way

suggests that anyone affirmatively "identified suspect 1 to be Warren Griffin and suspect

2 to be Anthony Dobbins." In other words, the "false statements" that are central to

---

[24] Dobbins' supplemental briefing does not include the same argument as to the Government's alleged
identification of the suspects and vehicle in the Wilson Video. In his supplemental briefing, Dobbins
addresses the averment that was actually included in the June 29 Affidavit – that there was probable cause
to believe the SUV depicted in the Wilson Video is Dobbins' white Cadillac Escalade. Dobbins, however,
has not withdrawn the argument contained in his original briefing. As to this averment, Dobbins now
claims it is verifiably false because, during the hearing, Honnet confirmed that he could not positively
identify the vehicle in the Wilson Video as being Dobbins' Cadillac Escalade. The fact that the vehicle in
the Wilson Video could not be positively identified is immaterial. The June 29 Affidavit did not positively
identify the vehicle. Rather, it contained an accurate description of the vehicle depicted in the video (a
white full-sized SUV) and stated that, given the information obtained during law enforcement's
investigation, there was probable cause to believe the white full-sized SUV depicted in the Wilson Video
was Dobbins' white Cadillac Escalade.

Dobbins' argument, were not included in the June 29 Affidavit (or in any of the affidavits supporting the subsequently issued warrants). [25]

Thus, the fact that it was impossible to definitively identify the suspects or the vehicle in the video, is irrelevant. Honnet did not state that the suspects or the vehicle in the Wilson Video had been affirmatively identified by anyone. Instead, he averred that, given facts developed during the investigation, there was probable cause to believe that Dobbins traveled from the Southern District of Illinois to Chicago, Illinois on the day Wilson was murdered, that Dobbins was in the vicinity of the crime scene when Wilson was murdered, and that the White full-size SUV depicted in the video was Dobbins' Cadillac Escalade.

This evidence includes but is not limited to the following:  (1) evidence showing that Dobbins held himself and Griffin out as Board Members of the Gangster Disciples and as being in control the gang's activities in Missouri and Illinois; (2) the existence of "significant strife" among members of the Gangster Disciples based on recent leadership changes, and Wilson's role as a known Gangster Disciple leader opposed to Dobbins and Griffin; (3) evidence showing that Dobbins owns a vehicle that matches the description of the vehicle in the Wilson Video; (4) evidence that Dobbins' vehicle was traveling near the location of Wilson's murder shortly before and shortly after the shooting,; (5)

---

[25] After reviewing the subject affidavits, the Court is perplexed by counsel's representations regarding the averments allegedly contained therein. Dobbins' Motion to Suppress repeatedly states that the affiant identified Suspect One as being Griffin and Suspect Two as being Dobbins, and that the affiant affirmatively identified the vehicle as being Dobbins white Cadillac Escalade. No such averments were made, and the Court is struggling to understand how counsel could reasonably read the subject affidavits to include these statements.

evidence indicating that Suspect Two shot himself before or after shooting Wilson; (6) evidence demonstrating that Dobbins was treated for a gunshot wound shortly after Wilson's murder; (7) Dobbins' decision to leave the hospital when he was told that law enforcement was in route to speak to him; and (8) Dobbins' claim that he received a gunshot wound in East St. Louis, Illinois at approximately the same time his Cadillac SUV was observed in Chicago, Illinois.

Dobbins also argues that the June 29 Affidavit falsely avers that "Ernest Wilson was shot two times in the head and two times in the back" and that "five rounds were shot into Ernest Wilson's body." (Doc. 494, p. 4). Dobbins contends that this is inconsistent with the medical examiner's report. Dobbins, however, has not presented any evidence (such as the medical examiner's report) demonstrating that this was a false statement.[26] Further, the June 29 Affidavit does not state that "five rounds were shot into Ernest Wilson's body." Instead, the June 29 Affidavit states that an individual by the name of Robinson indicated, during a recorded phone conversation with an incarcerated individual, that he was told Wilson had been shot five times. This is entirely different than averring that "five rounds were shot into Ernest Wilson's body."

For these reasons, the Court finds that, despite counsel's representations to the contrary, the June 29 Affidavit does not falsely allege that Dobbins and Griffin have been identified as the suspects in the Wilson video, nor does it falsely allege that the vehicle in

---

[26] During the hearing, the Government indicated that the medical examiner's report indicates that there were four shotgun wounds to Mr. Wilson. No evidence has been presented to the Court demonstrating a falsity in the June 29 Affidavit as to the number of times Wilson was shot or the location of the wounds. Then, of course, there is the issue of materiality. Even assuming the June 29 Affidavit was inaccurate in this regard, it would not have been material to the probable cause determination.

the Wilson Video is Dobbins' Cadillac Escalade. Finally, Dobbins has failed to establish that the June 29 Affidavit includes inaccurate information regarding the number of times Wilson was shot or the location of his gunshot wounds or that such information was material to the probable cause finding.

> ### 2.   Other Alleged Misrepresentations Regarding the Wilson Video

As to the Wilson Video, after eliminating the allegedly false averments discussed above, the following allegations remain to be addressed:

> 1. The claim that Suspect Two discharged a round into himself while attempting to unholster his firearm.
>
> 2. The claim that, after shooting Wilson and himself, Suspect Two limped towards the SUV.

The Court has reviewed the Wilson Video. Although the security footage is in black and white and was taken on a rainy evening, it is not grainy. The street is well lighted, and the picture on the video is clear. Upon reviewing the video, the Court was able to observe the following:

> 1. A white full-size SUV is depicted driving South on Euclid. The vehicle's license plate and make and model are not identifiable.
>
> 2. The white SUV parks on the street. Two suspects exit the vehicle and walk north on Euclid Avenue.
>
> 3. The two the suspects disappear from the camera's view.
>
> 4. One of the suspects (Suspect One) is observed walking south on Euclid Avenue with Wilson. Wilson and Suspect One stop walking approximately one block later (near the location of the white SUV) and appear to be engaged in conversation.
>
> 5. The second suspect (Suspect Two) appears on the video again, walking south on Euclid (walking towards Suspect One and Wilson).

6.  Suspect Two reaches Wilson and opens fire on Wilson. Five muzzle flashes can be seen, including one muzzle flash that appears to go off between Suspect Two's legs. Suspect Two runs toward the SUV and appears to slow when he reaches the sidewalk near the passenger side door. Suspect Two appears to limp or stumble as he steps onto the sidewalk and moves toward the passenger side of the SUV.

Considering the record as a whole, the Court finds that Agent Honnet did not intentionally or with reckless disregard for the truth, misrepresent that the Wilson Video depicts (1) Suspect Two accidentally discharging a round into himself or (2) Suspect Two limping after shooting Wilson. During his testimony, Honnet admitted that he was mistaken regarding whether Suspect Two shot himself while attempting to holster or unholster his gun. On this issue, the Court credits Honnet's testimony, indicating that his averments regarding the order of operations (i.e. whether Suspect Two shot himself before or after attempting to holster his gun and/or whether Suspect Two shot himself before or after he shot and killed Wilson) was an unintentional misrepresentation. Further, even if it was an intentional falsity, it was not material and would not have altered the probable cause determination.

### 3.  Remaining Allegations Regarding False Statements in the June 29 Affidavit

In his supplemental briefing, Dobbins contends that the June 29 Affidavit falsely claims that Dobbins and Griffin "were associated with significant strife among members of the Gangster Disciples that involved Dushawn Wharton a/k/a Assassin." But the June 29 Affidavit (and the affidavits in support of the subsequently issued warrants) do not state that Dobbins was "associated with significant strife among members of the Gangster

Disciples that involved Dushawn Wharton a/k/a "Assassin." Rather, the assertion is that

Griffin was in a dispute with Wharton:

> The investigative team is also aware that during a recorded conversation with a confidential human source on January 12, 2017 - when discussing the list of board members that came from "the Old Man" (HOOVER) and those who were not on "the list" - GRIFFIN stated that the first order of business is "Assassin" (WHARTON) and that he has to get out of the way.

(Doc. 600-1, ¶ 10). No evidence has been presented indicating that this statement is

untrue, and Dobbins has failed to meet his burden in this regard.

Dobbins also contends that this statement is untrue because Honnet "could not

articulate any particular information regarding this strife." As to this issue, during direct

examination, Honnet offered the following testimony:

> Q. On page two, paragraph five of that affidavit you indicated that there was significant strife among members of the Gangster Disciples; is that correct?
> A. Yes, ma'am, I did.
> Q. And that involved Assassin, which is Dushawn Wharton; is that correct?
> A. Yes.
> Q. What evidence did you have that Anthony Dobbins had anything to do with that strife?
> A. That would be I believe information from the FBI, ma'am.
> Q. And what is that information?
> A. Basically that. They had heard that Anthony Dobbins and Warren Griffin were associated with the strife that the Gangster Disciples were going through at that time.
> Q. And particularly with Assassin?
> A. Yes.
> Q. And what was that strife that you learned?
> A. There was a nationwide split between the north and the south.
> Q. How did that pertain to Assassin?
> A. Assassin was put in his position by Shante Craig, who was recently incarcerated at the time, and he was the individual who was responsible for management for the 36 states outside of Illinois. He was responsible for the management for the southern states and Wharton had been put in his governor of governor's position by Craig.

Q. What did Anthony Dobbins have to do with that?
A. Just his association with Warren Griffin. That's all I was aware of at that time.
Q. Nothing particular to that situation?
A. No, ma'am.

At most, Honnet's testimony indicates that he was not personally aware of any information connecting Dobbins to Dushawn (other than his connection to Griffin). But, as already explained, the June 29 Affidavit does not allege that Dobbins was in a conflict with Dushawn. The June 29 Affidavit indicates that Griffin was in a dispute with Dushawn. It also generally indicates that there was strife within the organization and that both Dobbins and Griffin were associated with that strife in various ways. No evidence has been presented indicating that these are untrue statements.

Further, Dobbins' arguments regarding Honnet's lack of personal knowledge or his inability to provide additional details do not establish falsity and are irrelevant to the probable cause determination. It is well-settled that an officer is entitled to rely on information gathered by other law enforcement officers when drafting a probable cause affidavit. *See, e.g.*, *United States v. Ventresca*, 380 U.S. 102, 111 (1965) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number."); *Bruce v. Guernsey*, 777 F.3d 872, 876 (7th Cir. 2015) (considering the collective knowledge doctrine, an officer need not personally witness matters giving rise to probable cause); *Suarez v. Town of Ogden Dunes, Ind.*, 581 F.3d 591, 597 (7th Cir. 2009) (an officer is "entitled to rely on the collective knowledge of all the investigating officers in making his warrant request."); *United States v. Hollingsworth*, 495 F.3d 795, 805 (7th Cir. 2007) ("[A] search warrant need

not be based on first-hand observations."). Honnet testified that he was one of many investigators on the case and that he obtained information from other law enforcement officers. Each of his affidavits, including the June 29 Affidavit, indicated the same. The fact that Honnet was not personally aware of or could not provide more detailed information regarding the "strife" within the Gangster Disciples is insignificant.

Dobbins raises similar arguments regarding numerous other averments in the June 29 Affidavit. For example, Dobbins contends the assertion that Larry Hoover designated Dobbins and Griffin as board members is false because it "was not verified." First, Dobbins misinterprets the subject averment. Honnet did not state that Hoover had in fact designated Dobbins and Griffin as board members. Rather, he indicated that *Dobbins* had "repeatedly maintained" that this was the case. Second, Honnet testified that this information was gathered by investigators working for the Bureau of Prisons and the FBI. As discussed above, Honnet was entitled to rely on this information; the fact that he did not personally confirm information provided by other law enforcement officers does not establish a falsity in the affidavit.

Dobbins also contends that averments regarding (1) Dobbins' and Griffin's responsibility for managing Gangster Disciples members in Missouri and Southern Illinois, (2) Dobbins' and Griffin's management activities and/or strategies, and (3) disputes arising from Dobbins' and Griffin's management activities are false. Dobbins, however, has not presented any evidence indicating that these statements are false. Instead, he argues that the statements are generalized, unverified, and/or criticizes

34

Honnet for failing to provide additional specific details during his testimony. But, as discussed above, this is not the standard.

Finally, Dobbins contends that averments in the June 29 Affidavit pertaining to (1) the telephone conversation between Anthony Robinson and an inmate at Statesville Correctional Center ("Robinson phone call") and (2) Clarence Michael, an alleged criminal coconspirator of Griffin, landing a plane in Cahokia, Illinois are false. Dobbins criticizes the averment pertaining to the Robinson phone call because some of the information is inaccurate and/or conflicts with the Wilson Video. Honnet, however, merely averred that the conversation occurred – not that the information discussed was true. Dobbins objects to the information pertaining to Clarence Michael because Michael is not linked to Dobbins (other than by association to Griffin). But, once again, this is not the standard. Dobbins presents no evidence indicating that the claims as to Clarence Michael are untrue.

### 4. Griffin's Contentions

In Griffin's First and Second Motion to Suppress (Docs. 464 and 465), he seeks to suppress all evidence seized as a result of the Cadillac GPS Warrant (Doc. 600-3). He also seeks to suppress all evidence seized as a result of two warrants for records pertaining a cellular telephone ending in 9807 (Docs. 604-1 and 604-2) and one warrant for records pertaining to four cellular telephones allegedly being used by Griffin (Doc. 604-3). The only specific arguments Griffin raises as to these affidavits is that: (1) they falsely allege that the Wilson Video depicts Suspect Two shooting himself and limping following the shooting, and (2) they are "internally inconsistent when asserting that Mr. Griffin

committed acts in furtherance of a national 'Gangster Disciple' RICO Conspiracy but also at the same time contrary to the wishes and aims of the national 'Gangster Disciples.'"

The Court has already assessed and rejected the first contention. The Court also rejects the second contention. The subject affidavits do not aver that Griffin acted "contrary to the wishes and aims of the national Gangster Disciples." The subject affidavits allege that Griffin was a member and leader within the organization, that there was conflict between various factions of the organization, and that Griffin conflicted with other leaders within the organization. Alleging that Griffin conflicted with other leaders in the organization (or acted contrary to their wishes) is not inconsistent with the allegation that there is probable cause to believe that violent crimes and violations of 18 U.S.C. § 1959 have been committed.

## B.    Probable Cause for the June 29 Search Warrant

The Court finds that there were no intentionally or recklessly false statements in the June 29 Affidavit. The affidavit included one unintentional misrepresentation regarding when and/or how Suspect Two appears to have shot himself based on a viewing of the Wilson Video. A successful *Franks* challenge, however, requires that the allegedly false information be necessary to the finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 156 (1978). Whether Suspect Two shot himself while attempting to re-holster or unholster his gun and/or whether he shot himself immediately before or after killing Wilson is immaterial to the finding of probable cause and to issuance of the search warrant.

After reviewing the June 29 Affidavit in a practical, common-sense manner, and considering the circumstances of the investigation into the Gangster Disciple street and prison gang as a whole, the Court concludes that the affidavit established probable cause. The June 29 Affidavit presented persuasive evidence that Dobbins' vehicle was at the scene of Wilson's murder. It also presented evidence sufficient to conclude that there was probable cause to believe that Dobbins and Griffin are the suspects depicted in the video, including but not limited to the following:

1. Dobbins was maintaining that he and Griffin were board members of the Gangster Disciples, responsible for the gang's activities in Missouri and Illinois.
2. Dobbins and Griffin were criminal associates, in conflict with various members of the Gangster Disciples.
3. Given the conflict within the Gangster Disciples, and Wilson's role as a known Gangster Disciples leader opposed to Dobbins and Griffin, Dobbins and Griffin had a reason to remove Wilson from power.
4. Griffin was involved in a previous attempt to kill a Gangster Disciples leader that he conflicted with.
5. Dobbins' vehicle was observed near the scene of Wilson's murder before and after the shooting.
6. Griffin, through his association with criminal conspirator Clarence Michael, had the means of traveling to Cahokia, Illinois on May 18, 2018.
7. The Wilson Video depicted a vehicle matching the description of Dobbins' vehicle.
8. Dobbins was treated for a gunshot wound on May 20, 2018.
9. Dobbins left the hospital after learning law enforcement was in route to speak with him.
10. Dobbins claimed he was shot by an unknown drug addict in East St. Louis, Illinois at or near the time his vehicle was observed in Chicago, Illinois.
11. Dobbins was utilizing the cellular phone that was the target of the warrant.

This information sufficed to support issuance of the warrant. *See United States v. Adams*, 934 F.3d 720, 725 (7th Cir. 2019) ("Probable cause exists when the circumstances indicate a reasonable probability that evidence of crime will be found in a particular

location; neither an absolute certainty nor even a preponderance of the evidence is necessary.").

*Remaining Search Warrants*

Dobbins contends that the remaining search warrants are all fruit of the allegedly illegal search warrant issued and executed on June 29, 2018. As explained above, however, the June 29, 2018 search warrant is a valid warrant, supported by probable cause. Dobbins and Griffin both argue that the remaining search warrants are illegal because they contain the same language as to the Wilson Video and are lacking in probable cause. However, as explained above, Agent Honnet's description of the Wilson Video did not contain any intentionally or recklessly material false statements. Defendants make no other arguments as to the remaining information provided in these search warrants and whether the other information provides probable cause.

The Court has reviewed the remaining search warrants at issue and concludes that the warrants were based on sufficient probable cause. As with the June 29 Affidavit, reviewing these search warrants and supporting affidavits, and considering the circumstances of the investigation as a whole, the Court finds that each of the supporting affidavits establish probable cause because they showed there was a fair probability that evidence of violent crimes and violations of 18 U.S.C. § 1959 would be found in a particular place or through a particular means (e.g., on Defendants' cell phones, on a GPS tracking device, in a residence or vehicle…).

## VIII.  CONCLUSION

Defendant Anthony Dobbins' Motion to Suppress Search Warrants of Residence Vehicle, Cell Phone, GPS and Precision Location Information and its Data (Doc. 494), and the portions of Defendant Warren Griffin's Motion to Suppress Physical Evidence and Statements and Identifications (Doc. 465) and Motion to Suppress Electronic Surveillance (Doc. 464) seeking to suppress evidence seized in connection with the warrants addressed herein are **DENIED**.

**IT IS SO ORDERED**
DATE: December 20, 2022

David W. Dugan
United States District Judge